UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
DANIELA COLLINS,                                          :
                                                          :
                                Plaintiff,                :
                                                          :        **MEMORANDUM DECISION AND**
              -against-                                   :        **ORDER**
                                                          :
COMMISSIONER OF SOCIAL SECURITY,                          :        20-cv-4693 (BMC)
                                                          :
                                Defendant.                :
                                                          :
--------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff seeks review of the decision of the Commissioner of Social Security, following a

hearing before an Administrative Law Judge, that she is not disabled for purposes of receiving

disability benefits under Titles II and XVI of the Social Security Act.  For the reasons described

below, the Commissioner's denial of benefits is reversed, and the action will be remanded solely

for the calculation of benefits.

## BACKGROUND

      Plaintiff filed her Title II and XVI applications on January 12, 2017, alleging disability

beginning November 30, 2016 due to polycystic ovary syndrome ("PCOS"), pseudotumor

cerebri,[1] and brain swelling.  The state agency denied the applications and plaintiff requested a

hearing.  On June 3, 2019, plaintiff appeared with counsel and testified before an ALJ.  The ALJ

issued an unfavorable decision on August 16, 2019, finding plaintiff not disabled.  The ALJ's

decision became final when, on September 29, 2020, the Appeals Council denied plaintiff's

request for review.  This action followed.

---

[1] Pseudotumor cerebri, also known as intracranial hypertension or benign intracranial hypertension, is a disorder
related to high pressure in the brain that causes signs and symptoms of a brain tumor.

A.     Medical Evidence

On July 7, 2015, plaintiff went to the emergency room with complaints of headache, dizziness, and vision problems, and was diagnosed with pseudotumor cerebri.  She received a lumbar puncture (*i.e.*, spinal tap) to relieve fluid pressure in her head.  When she saw her primary care provider, Evan Schwarzwald, M.D., the following week for a routine blood pressure check (plaintiff has a history of obesity, PCOS, and hypertension), she reported residual symptoms of pseudotumor cerebri.  On July 15, 2015, the next day, plaintiff saw ophthalmologist Howard D. Pomeranz, M.D., for treatment of severe papilledema (swelling of the optic nerve) due to pseudotumor cerebri.  The day after that, on July 16, 2015, plaintiff began seeing neurologist Clair Cascella, M.D.  She reported mild daily headaches with some dizziness and nausea following her course of treatment at the hospital.  Plaintiff underwent additional lumbar punctures in March 2016 and November 2016.

Plaintiff also saw endocrinologist Jay Schuval, D.O., for continued management of PCOS, between November 2015 and October 2016.  She complained of headache but denied fatigue, abdominal pain, pelvic pain, muscle cramps, or photophobia.  In December 2015, a pelvic sonogram showed a small fibroid.

After the alleged onset date, on December 2, 2016, Dr. Cascella wrote a letter to plaintiff's employer requesting accommodation for her symptoms.  The letter stated that plaintiff had difficulty and pain with lifting more than five pounds, driving more than one hour per day, performing more than two hours of field work per day, and using a computer screen more than one hour without a break, and that plaintiff may need to stop what she is doing and sit down due to head pressure that could lead to headache.

Plaintiff attended an eye examination with Dr. Pomeranz in December 2016.  Her exam was unchanged, and she was told to follow up in four months.

In February 2017, plaintiff visited Dr. Schuval for a follow-up appointment regarding her PCOS.  Plaintiff denied fatigue, headache, light sensitivity, dizziness, difficulty with concentration, or pelvic pain.  Dr. Schuval stated that plaintiff's PCOS was more stable and her hypertension well controlled.

On March 3, 2017, plaintiff underwent a physical examination by consultative examiner Syed Asad, M.D., in connection with her application for disability benefits.  Plaintiff appeared in no acute distress and had a normal gait and stance, could walk on her heels and toes without difficulty, perform a full squat, get on and off the table without assistance, and rise from a chair without difficulty.  Plaintiff reported mild lumbar pain due to having undergone multiple spinal taps.  She had full ranges of motion in her arms and legs, normal reflexes, no sensory deficit, and full (5/5) strength.  She had intact hand and finger dexterity and full (5/5) grip strength.  Dr. Asad opined that plaintiff had mild limitations for bending and no other physical limitations.  He said plaintiff should avoid respiratory irritants due to her history of asthma.

That same day, plaintiff also attended a psychiatric evaluation with Kathleen Acer, Ph.D. A mental status examination showed appropriate eye contact, adequate speech, anxious mood and affect, intact attention and concentration, intact memory, average cognitive functioning, and fair insight and judgment.  Dr. Acer opined that plaintiff had no limitations in her ability to understand, remember, and apply simple or complex instructions and directions.  Dr. Acer also opined that plaintiff may have minor limitations in her ability to interact appropriately with others, regulate emotions, and use reason and judgment.

In May 2017, plaintiff returned to Dr. Schuval complaining of debilitating pressure headaches, abdominal and pelvic pain with menstrual cycle, anxiety, and fatigue.  Her physical examination showed normal attention span and concentration, a full range of motion in all joints, and no focal neurological deficits with normal sensation, reflexes, coordination, and muscle strength.  Dr. Schuval authored a letter, received by the agency on July 27, 2017, stating that plaintiff's symptoms included daily difficulty with fatigue and insulin resistance, and bouts of abdominal pain.

In June 2017, Dr. Cascella wrote a letter stating that plaintiff experienced constant head pressure, blurry vision, photophobia, and dizziness that limited her ability to focus and concentrate.  Dr. Cascella said Plaintiff's symptoms worsened with exertion, loud noises, rapid movements, fluorescent lighting, and using her computer.  She opined that plaintiff should not work for the next 12 months.

An eye examination in July 2017 showed some optic disc swelling consistent with prior examinations and thinning of the retinal nerve fiber in the left eye.  Plaintiff reported worsening headaches.  In November 2017, plaintiff had another lumbar puncture to release fluid pressure.

Plaintiff continued to visit Dr. Schuval in September 2017 and in January, June, and September 2018.  Plaintiff complained of headaches but otherwise denied fatigue, vision problems or light sensitivity, abdominal or pelvic pain, muscle cramps or back pain, headaches, photophobia, and difficulty with concentration, and her physical examinations remained unchanged.

In August 2018, plaintiff incurred a mild concussion in a motor vehicle accident.  She began seeing a neurologist, Gary Kaplan, M.D., in September 2018, with appointments in October 2018, January 2019, and April 2019.  On April 23, 2019, Dr. Kaplan completed a

questionnaire form and stated that plaintiff had debilitating headaches with moderate pain and mild fatigue.  He said plaintiff's symptoms frequently interfered with attention and concentration, and she would likely miss work more than three times per month and be off task more than 20% of the time.  Dr. Kaplan opined that plaintiff could occasionally lift up to nine pounds; sit for four hours in an eight-hour day; stand/walk for one hour in an eight-hour day; occasionally reach and use her hands but never climb, balance, stoop, kneel, crawl, crouch, or tolerate noise; and would need unscheduled breaks every hour for 15 minutes at a time.

On April 15, 2019, Dr. Cascella wrote a letter indicating that plaintiff could not lift more than five pounds and could have no more than one hour of screen time without a break.  She stated that Plaintiff was unable to perform any kind of steady employment for at least the next 12 to 24 months.

On April 18, 2019, Dr. Pomeranz completed a questionnaire form and stated that plaintiff had a history of papilledema and lumbar punctures due to elevated intracranial pressure.  He opined that plaintiff had frequent headaches and light sensitivity due to elevated intracranial pressure, which frequently interfered with her ability to maintain focus and concentration.  He opined that plaintiff would miss work three or more times per month, be off task more than 20% of the time, and would need unscheduled breaks every one to two hours for 15 to 30 minutes.

On April 30, 2019, Dr. Schuval wrote a letter stating that PCOS contributed to plaintiff's symptoms of fatigue, mood swings, weight gain, and abdominal and pelvic pain, and opining that plaintiff could not perform any work duties at that time.

On May 8, 2019, Dr. Pomeranz wrote a letter indicating that plaintiff experienced headaches, blurry vision, and light sensitivity, which limited her ability to focus and concentrate. He indicated that her symptoms worsened when using a computer or in the presence of

fluorescent lighting.  He opined that these issues contribute to plaintiff's difficulty in performing

tasks at work that are dependent on vision.

In an undated letter, Eric Karlin, M.D., plaintiff's friend, stated that he had witnessed her

severe headaches, photophobia, fatigue, and inability to concentrate, and that he believed her

health had made her unable to work.

Plaintiff submitted additional evidence to the Appeals Council after the ALJ's decision.

Plaintiff saw neurologist Dr. Cascella almost monthly between April 2017 and June 2019.

Physical examinations showed normal attention span and concentration, as well as no

neurological deficits with full strength, intact reflexes, normal sensation, normal coordination,

and normal gait, but plaintiff received trigger point injections and Oxycodone for headaches.  On

August 26, 2019, Dr. Kaplan wrote a letter requesting that his opinion to be given more weight.

He stated that excessive physical activity, noise, and bright light exacerbated plaintiff's

headaches.  He noted that patients like plaintiff often have a normal neurologic examination, but

plaintiff's ability to function is compromised by her frequent headaches, which are exacerbated

by activity.  On September 3, 2019, Dr. Schuval wrote a letter stating that "it is impossible for

[plaintiff] to hold a job" due to her symptoms.

B.      The ALJ's Decision

The ALJ found that plaintiff had severe impairments of pseudotumor cerebri and obesity,

and that plaintiff's impairments did not satisfy the criteria of a listed impairment.  The ALJ

found that Plaintiff retained the residual functional capacity ("RFC") to perform a range of

sedentary work, except that she was limited to: occasional balancing, stooping, crouching,

kneeling, crawling, and climbing ramps or stairs; no climbing ladders, ropes, or scaffolds;

moderately loud noise intensity; occasional exposure to poorly ventilated areas, chemicals,

moving mechanical parts, unprotected heights, and irritants such as fumes, odors, dusts, and

gases; occasional operation of a motor vehicle; and routine and repetitive tasks.  The ALJ found

that plaintiff could not perform her past relevant work but that she could perform other work

existing in significant numbers in the national economy, and thus was not disabled.

## DISCUSSION

An ALJ's RFC determination must be supported by substantial evidence.  Rosa v.

Callahan, 168 F.3d 72, 81 (2d Cir. 1999).  Substantial evidence is defined as "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated

Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "Where the Commissioner's decision rests on

adequate findings supported by evidence having rational probative force, [the Court] will not

substitute [its] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586

(2d Cir. 2002).

To be supported by substantial evidence, "the ALJ's RFC determination must be

supported by competent medical opinion; the ALJ is not free to form his own medical opinion

based on the raw medical evidence."  Arias v. Saul, 2020 WL 1989277, at *9 (E.D.N.Y. Apr. 25,

2020) (quoting Goble v. Colvin, No. 15-CV-6302, 2016 WL 3179901, at *6 (W.D.N.Y. June 8,

2016) (collecting cases)).  A treating physician's statement that a claimant is disabled is not

determinative because it is the ALJ who is tasked with reaching an RFC assessment based on the

record as a whole.  See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  But "because an RFC

determination is a medical determination, an ALJ who makes an RFC determination in the

absence of a supporting expert medical opinion has improperly substituted his own opinion for

that of a physician, and has committed legal error."  Jackson v. Berryhill, No. 18-CV-04569,

2019 WL 4593648, at *8 (S.D.N.Y. Sept. 23, 2019) (quoting Felder v. Astrue, No. 10-CV-5747,

2012 WL 3993594, at *13 (E.D.N.Y. Sept. 11, 2012)).

I find that the ALJ's decision was not based on substantial evidence.  The problem with

the ALJ's analysis is best illustrated by her treatment of plaintiff's pseudotumor cerebri and its

associated symptoms.  The ALJ gave no more than "little weight" to the medical opinion

evidence from each of plaintiff's treating physicians.  As described below, these physicians

noted plaintiff's head pressure and headaches, among other symptoms, and opined that they limit

her ability to work, would require frequent breaks, and would cause her to be off task for a

substantial portion of the day.  But the ALJ found the opinions to be inconsistent with the

medical evidence of record based primarily on the fact that plaintiff had occasionally denied

symptoms of headaches at visits with her primary care physician.

Dr. Cascella treated plaintiff's pseudotumor cerebri since June 2015 and, in June 2017,

opined that plaintiff should not work for 12 months.  She stated that plaintiff experiences

constant head pressure, blurry photophobia and dizziness, which limits her ability to focus and

affects her concentration and memory.  The ALJ gave this opinion little weight, describing it as

inconsistent with the medical evidence because, among other things, plaintiff "does not

constantly complain of constant head pressure," citing how plaintiff "den[ied] headache

symptomology" during a few visits with her primary care physician.

The opinion of Dr. Kaplan, a neurologist who began seeing plaintiff in September 2018

and opined that plaintiff must avoid all noise and would be off-task more than 20% of the day,

was also afforded little weight and deemed inconsistent with the record because "plaintiff denied

symptoms of headaches."  Dr. Pomeranz, a neuro-ophthalmologist, noted that plaintiff

experiences elevated intracranial pressure resulting in headaches and light sensitivity, which

interfere with her attention and concentration, and would miss work three or more times per month and be off-task more than 20% of the day.  Again, the ALJ gave this opinion little weight, this time because the neurologist's proposed limitations "would preclude all work."  The opinion of Dr. Karlin, a friend of plaintiff who noted that he personally witnessed her experiencing significant headaches, was also deemed inconsistent with the record and given "little weight" based in part on plaintiff's occasional denial of headaches.

The ALJ's repeated invocation of this headache-denial evidence is a classic example of cherry picking.  In fact, the few records denying headaches are inconsistent with the other medical evidence in this case, and not the other way around.  Three specialists who regularly treated plaintiff noted her years-long significant head pressure and headaches due to pseudotumor cerebri; plaintiff takes oxycodone, a strong opioid pain medication, to manage her headache pain and receives trigger point injections for the same; and plaintiff received several lumbar punctures (at least two per year) in an effort to help alleviate the pressure.  The opinion evidence and treatment course thus suggest that plaintiff frequently has severe and debilitating headaches.  It is also worth noting that the records denying headaches were from plaintiff's primary care physician, who was not treating plaintiff for her neurological symptoms; records from the specialists treating plaintiff all indicate headaches.  And plaintiff need not suffer headaches at all times every day in order to credit the opinions of three different treating physicians (and a physician friend, and plaintiff herself) that she has a headache problem that significantly interferes with her ability to work.  The ALJ improperly rejected the opinions of plaintiff's treating physicians as inconsistent with the record based on cherry-picked evidence when, in fact, the opinions were largely consistent with each other, medical evidence in the record, and plaintiff's own testimony.

9

At times, the decision in this case reads as if the ALJ came to an RFC determination herself before evaluating any of the evidence.  For example, the ALJ evaluated evidence based on its "consisten[cy] with my residual functional capacity assessment."  This rationale strikes me as circular, as I don't see how the ALJ can reject an opinion as consistent or inconsistent with her own assessment when she should not be making her own assessment until she has considered that opinion.

The ALJ's rejection of Dr. Pomeranz's opinion because the limitations he described "would preclude all work" is similarly problematic.  It very well may be that plaintiff's conditions preclude work – plaintiff certainly thinks so – and the purpose of evaluating the medical opinion evidence is to determine whether that is the case.  The ALJ may choose to reject a treating physician's opinion that the plaintiff was disabled, as the ALJ did here in rejecting Dr. Pomeranz's statement that he supports the claimant's application for disability, but she may not reject an opinion as to plaintiff's capabilities simply because the proposed restrictions would preclude work.

The ALJ gave little weight to each of plaintiff's treating source opinions and, as the Commissioner admits, the ALJ did not adopt any one source opinion in this case.  The ALJ does not appear to have based her RFC assessment on the opinions of the consultative examiners, Dr. Asad and Dr. Acer, either.  Portions of Dr. Asad's opinion and all of Dr. Acer's opinion were given little weight.  When asked at the hearing what information the ALJ based her RFC determination on, the ALJ responded that it was "based on the totality of the evidence and [plaintiff's] testimony."

But the RFC does not appear to be based on any opinion evidence at all, and thus the ALJ's determination is not based on substantial evidence.  The portions of Dr. Asad's opinions

10

to which the ALJ afforded "great weight" only addressed plaintiff's history of asthma; as to plaintiff's pseudotumor cerebri and associated symptoms and restrictions, the ALJ gave little weight to Dr. Asad's opinion because it failed to recognize the "symptoms of head pressure, headaches, fatigue, and foggy brain" that Dr. Cascella noted.  And, as described above, the ALJ gave little weight to every other opinion in the record.  Of course, the ALJ need not adopt any one physician's opinion.  But it is unclear which opinion or combination of opinions could have provided the basis for the ALJ's RFC determination that plaintiff could perform sedentary work with specific restrictions, given that all of the relevant opinion evidence was afforded little weight and each treating physician's opinion suggests a more restrictive RFC.

When the Court finds a lack of substantial evidence for the Commissioner's findings, there are two options for proceeding.  "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate."  Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004), as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005).  "That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim,'" remand is particularly appropriate.  Id. (quoting Rosa, 168 F.3d at 83).  This will generally be the case if there are gaps in the administrative record or the ALJ has applied an improper legal standard; in such cases, the Court will remand the case for further development of the evidence.  See Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).

On the other hand, where the Court has no apparent basis to conclude that a more complete record might support the Commissioner's decision, the Court may opt simply to remand for a calculation of benefits.  Butts, 388 F.3d at 385-86.  "Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the

Commissioner 'with or without remanding the cause for a rehearing.'" Id. at 385 (quoting 42 U.S.C. § 405(g)).

Remand solely for a calculation of benefits is appropriate here.  This is not a case in which the ALJ failed to develop the record sufficiently to make appropriate disability determinations.  See id. at 386 (remand for further findings would help to assure the proper disposition of the claim with undeveloped record).  Rather, the Court is persuaded that the ALJ "reached a mistaken conclusion on an otherwise complete record." Rosa, 168 F.3d at 83.  There is no medical opinion in the record contradicting the opinions of plaintiff's treating physicians, who concluded that plaintiff cannot work on a regular basis, except those of the consultative examiners, whose opinions the ALJ discounted as inconsistent with the record evidence in any event.  Further, the Commissioner has not shown that remand is necessary to consider any additional evidence not in the record.

## CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted, the Commissioner's motion for judgment on the pleadings is denied, the Commissioner's denial of benefits is reversed, and the case is remanded solely for the calculation of benefits.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
         July 20, 2021

12